### 53070. HOWARD, WEIL, LABOUISSE, FREDERICKS, INC. v. ABERCROMBIE.

ARGUED NOVEMBER 2, 1976 — DECIDED NOVEMBER 12, 1976.

*Robinson, Harben, Armstrong & Millikan, Emory F.*

*Robinson,* for appellant.

*Sartain & Carey, Jack M. Carey, Jefferson W. Willis,* for appellee.

DEEN, Presiding Judge.

1. All enumerations of error except one deal basically with the same subject matter. The evidence developed that the home office of the brokerage firm was in New Orleans, while that with which the plaintiff dealt was in Gainesville, Ga. Abercrombie was an active trader on margin, with committed deliveries in some instances in excess of $2,000,000. Abercrombie was acquainted with another customer, Harry Waters; in relation to an inactive account, H & H Poultry Co., they had jointly talked with Slaton, who handled Waters' affairs with the company, were told it could be reactivated on a double margin basis, with Abercrombie stating he would "stand behind the account"; that both placed orders, both put money in it, and it was eventually closed out with a credit balance.

At about the same time the account in question was opened in the name of Harry Waters and ran for several months after being reactivated. Waters did most of the trading but some orders were placed by Abercrombie and during this three-month period over $115,000 was put up by Abercrombie, who denominated these sums as loans. On 13 occasions during the period of this activity this account accumulated a debit balance, and on each of these occasions Abercrombie, when notified, by letter authorized the transfer of funds from his account to cover the debit. The following relates to the opening of the Waters account: "A. [Waters] had not made a transaction in the account since February 14, I believe, a position was closed out, then on February 26... Mr. Waters approached me and told me... Q. On the occasion you are attempting to testify was Mr. Bob present? A. Mr. Abercrombie approached me that day and discussed this matter with me... Q. What did Mr. Abercrombie tell you? A. He told me they would start entering orders in that account, and that he would stand behind the margin." The last answer was stricken on the ground that an oral contract of guarantee was inadmissible as within the Statute of

Frauds.

Again, an official in the New Orleans office testified that he placed two restrictions on the reopening of the Waters account: that margins be doubled and that Abercrombie guarantee the account. An objection was sustained to the following: "Were those conditions accepted?" "I had received assurances," and "Would you have permitted the reactivation of the Waters account for margin trading without somebody backing or guaranteeing the account?"

Waters testified that he owed the debit amount, and that he had acknowledged this in writing to the defendant. Abercrombie, when asked to make good the deficit, replied, "Wayne, I'm not in a position to lend him any more money, I can't go any further."

While it is obvious that the brokerage firm had psychological reasons to believe that any deficit accumulated by Waters in his personal account would be covered by Abercrombie, and it is uncontested that Abercrombie had "backed" Waters by lending him money and covering his deficits, we agree with the court and jury that there was no legal obligation upon him to continue doing so. It is not contended that the oral "guaranty," if made, was for any particular amount of money. Abercrombie did back Waters in the ways stated; this did not bind him to continue making good Waters' losses. Had the defendant wanted an unconditional guaranty to this effect it should of course have had the matter committed to writing. Such a writing would doubtless state the ceiling amount of funds pledged, the time limit, and other general conditions.

2. A promise to answer for the debt, default, or miscarriage of another must be in writing. Code § 20-401 (2). There are various exceptions: if the agreement of the third party guarantor is an original undertaking; that is, one furthering his own interests rather than underwriting the debt of another, it is not within the Statute of Frauds. *McLendon v. Frost,* 57 Ga. 448; *Casteel v. Allgood,* 31 Ga. App. 107 (1) (119 SE 456); *Scott Hudgens Realty & Mtg., Inc. v. Executive Action, Inc.,* 125 Ga. App. 81 (186 SE2d 504). "The promise required by this section to be in writing does not include an original undertaking

whereby a new promisor, for valuable consideration, substitutes himself as party who is to perform, and releases the original promisor." *State Hwy. Dept. v. Eagle Const. Co.,* 125 Ga. App. 678 (2) (188 SE2d 810). This exclusion does not apply here. There is no scintilla of evidence that the extension of credit to Waters was of benefit to Abercrombie, or that he in any way attempted to substitute himself for Waters as a potential debtor of the brokerage firm. Assuming the evidence objected to had been admitted, it would show no more than (a) an oral promise to "back" or "guarantee" Waters' account acted on by the firm, and (b) an intention by the latter not to issue further credit to Waters unless it was so guaranteed. But a viable guarantee this language would not show. The case is most nearly controlled by *Southern Coal & Coke Co. v. Randall,* 141 Ga. 48 (80 SE 285). There the debtor company was behind in its payments for shipments of coal. It desired to enter new orders, which the creditor was unwilling to fill. The president of the debtor corporation then orally stated that if they would continue shipping "he would guarantee they were paid." The court held that the promise of future payment was collateral and not an original undertaking, thus within the Statute of Frauds, and that it mattered not whether the promisor be considered a surety or guarantor. In that case as here the promisor undertook to offer himself as a surety for the future debt of another, the other continuing to be the principal debtor. This does not meet what Prof. Williston considers the true test of whether the undertaking is original rather than collateral: "If as between them the original debtor still ought to pay, the debt cannot be the promisor's own and he is undertaking to answer for the debt of another." 3 Williston on Contracts, (3d Ed.), p. 450, § 475. "When one person tells another to let a third person have goods and that he will see that the debt is paid, in order for the promisor to become bound in the absence of a writing, it is requisite that credit shall be given *exclusively* to the promisor." *Ross v. W. P. Stephens Lumber Co.,* 138 Ga. App. 748, 750 (227 SE2d 486) and see *Cruse v. Foster & Estes,* 76 Ga. 723. Even reliance on the oral promise will not remove it from the statute. *Coldwell Co. v. Cowart,* 138 Ga. 233, 246 (75 SE 425).

3. Two requested instructions defining an action for money had and received were objected to on the ground that they were repetitious and argumentative. The instructions were not argumentative. They consist of two sentences out of some 14 pages of instructions, and were adjusted to the evidence submitted.

*Judgment affirmed. Webb and Smith, JJ., concur.*